IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | 8:08CR249 |
| Plaintiff, ) | |
| ) | |
| vs. ) | SENTENCING MEMORANDUM |
| ) | |
| JOAN NINCEHELSER, a/k/a JOAN ) | |
| THIESSEN, ) | |
| ) | |
| Defendant. ) | |

This Sentencing Memorandum supplements findings made on the record at defendant's sentencing hearing on February 12, 2009.

**I. BACKGROUND**

Defendant was charged with conspiring to manufacture and attempt to manufacture 50 grams or more of actual methamphetamine, salts, isomers, or salts of its isomers, and possession of pseudoephedrine with intent of manufacture methamphetamine in violation of 21 U.S.C. §§ 841(a)(1) and 846. The offense carries a statutory term of imprisonment of five to forty years. Pursuant to a plea agreement, Nincehelser entered a plea of guilty to the conspiracy charge. Filing No. 34, Plea Agreement; Filing No. 31, text minute entry. The plea agreement contemplated cooperation by Nincehelser and provided that any cooperation would be considered by the United States Attorney in moving for a sentence reduction under United States Sentencing Guidelines ("U.S.S.G.") § 5K1.1, 18 U.S.C. 3553(e), and/or, Fed. R. Crim. P. 35(b). Filing No. 34, Plea Agreement at 2. The government also agreed to bring the defendant's cooperation to the attention of the court for the purpose of determining an appropriate sentence. *Id.* The parties agreed that the defendant should be held responsible for more than 50 grams but less than 150 grams of

actual methamphetamine and agreed to a base offense level of 32.  *Id.* at 3-4.  The parties further agreed that the defendant was not subject to an upward or downward adjustment for role in the offense and did not possess a firearm or other dangerous weapon in connection with the offense.  *Id.* at 4.  The court accepted the defendant's plea but deferred acceptance of the plea agreement pending the preparation of a Presentence Investigation Report (hereinafter, "PSR") by the United States Office of Probation (hereinafter, "the Probation Office") that calculated the defendant's sentence under the United States Sentencing Guidelines ("the Guidelines").  Filing No. 31, text minute entry.

In the PSR, the Probation Office identified U.S.S.G. § 2D1.1 as the applicable Guidelines base offense level provision and determined that, based on a quantity determination of more than 35 but less than 50 grams of methamphetamine (actual), the defendant's base offense level should be 30.  Filing No. 42, PSR (sealed) at 8, 23.  It also added a two-level increase under U.S.S.G. § 2D1.1(b)(10)(A)(i) because the offense involved a hazardous substance.  *Id.* at 9.  It then subtracted three levels for the defendant's acceptance of responsibility under U.S.S.G. § 3E1.1 (a) & (b), resulting in a total offense level of 29.  *Id.*  The defendant's criminal history category was calculated to be IV, based on the assessment of 6 criminal history points for convictions for possession of controlled substances, theft by unlawful taking and shoplifting, and 2 points for committing the crime within two years of being released from incarceration for another crime.  *Id.* at 10-13.  At criminal history category IV and base offense level 29, the defendant's sentencing range under the Guidelines is 121 to 151 months. *Id.* at 23.

The following facts are set out in the PSR.  *See id.* at 14-20.  The defendant was arrested along with two others for cooking methamphetamine in a hotel room in Omaha.

Daniel Baney was the leader of the conspiracy. The defendant and Baney were involved in a relationship at the time. The defendant's co-conspirators were sentenced to 120 and 132 months. *Id.* at 4.

Ms. Nincehelser is twenty-six years old. She has a history of anorexia nervosa beginning at age 12. She began drinking alcohol at about age 13 and running away from home at age 14. She first used methamphetamine at age 14. Her drug and alcohol abuse escalated when a boyfriend died in a car accident when she was 15. At 17, she experienced tremors and shaking when she went without drinking. She began using one-half to one gram of methamphetamine daily at age 17. At age 20, she was incarcerated in a work camp and was on house arrest for seven months. She did not use drugs or alcohol during that seven-month period, but started smoking methamphetamine again at age 21. For the following two years she smoked a "teener" per day, and began writing bad checks to obtain methamphetamine. She violated probation and was sentenced to prison on August 18, 2004. Upon her release from prison at age 22, she immediately returned to using drugs. From ages 24-25, she used methamphetamine daily, up to one-half gram per day.

She was involved in a physically violent relationship at age 15 and 16, and was locked in a basement and burned by her boyfriend. She was sexually assaulted by a stranger at age 16 and was raped and penetrated with a beer bottle. Also, a friend was murdered when she was 16. Ms. Nincehelser reported that her previous boyfriends have abused her emotionally, sexually, and physically. She was married for two years to an abusive alcoholic and drug addict. She was involved in a relationship with Baney for seven years. He was mentally and physically abusive and threatened to kill her mother.

Ms. Nincehelser has been treated for bipolar disorder, anxiety and depression and had been prescribed Lithium, Depacote, Klonopin, Paxil, Xoloft, Effexor, Xanax, Seroquel, Lamictal and Valium. She suffers from anxiety and panic disorder. In her substance abuse evaluation in 2008, Ms. Nincehelser was diagnosed as having amphetamine dependence, cannabis dependence, and alcohol dependence in early full remission.

Ms. Nincehelser was placed on pretrial release on September 8, 2008, with the condition she reside at Catholic Charities Omaha Campus for Hope. She was discharged from their program on October 6, 2008, and transitioned to the White Lion Oxford House in Omaha. She is employed and has tested negative on all drug screens.

Both parties accepted the guidelines calculation in the PSR. Filing No. 35 and 37. At the sentencing hearing, the defendant moved for a downward departure and for a sentence outside the Guidelines.

## II. DISCUSSION

### A. Law

The Sentencing Guidelines are no longer mandatory. *United States v. Booker,* 543 U.S. 220, 260-61 (2005). In *Booker,* the Supreme Court held that the mandatory Sentencing Guidelines system violated the Sixth Amendment. *Booker,* 543 U.S. at 226-27. In the *Booker* remedial opinion, the Supreme Court determined that the constitutional violation would be cured by modifying the federal sentencing statute to make the Guidelines effectively advisory. *Id.* at 245. Consequently, the range of choice in sentencing dictated by the facts of the case has been significantly broadened. *Gall v. United States,* 552 U.S. —, —, 128 S. Ct. 586, 602 (2007) (finding a sentence outside the Guidelines to be reasonable); *Kimbrough v. United States,* 552 U.S. —, —, 128 S. Ct. 558,

570 (2007) (noting that courts may vary from Guidelines ranges based solely on policy considerations, including disagreements with the Guidelines); *Rita v. United States,* 551 U.S. —, —, 127 S. Ct. 2456, 2465 (2007) (holding that a district court may consider arguments that "the Guidelines sentence itself fails properly to reflect § 3553(a) considerations"); *Cunningham v. California,* 549 U.S. 270, —, 127 S. Ct. 856, 867 (2007) (stating that judges are no longer tied to the sentencing range indicated in the Guidelines but are obliged to "take account of" that range along with the sentencing goals Congress enumerated in 18 U.S.C. § 3553(a) of the Sentencing Reform Act).

District courts must therefore "give respectful consideration to the Guidelines," but are permitted "'to tailor the sentence in light of other statutory concerns as well.'" *Kimbrough,* 552 U.S. at —, 128 S. Ct. at 570 (*quoting Booker,* 543 U.S. at 245-246); *Gall,* — U.S. at —, 128 S. Ct. at 596 (stating "[t]he Guidelines are not the only consideration, the district judge should consider all of the § 3553(a) factors").  These cases "mean that the district court is free to make its own reasonable application of the § 3553(a) factors, and to reject (after due consideration) the advice of the Guidelines." *Kimbrough,* 552 U.S. at —, 128 S. Ct. at 577 (Scalia, J., concurring); *see also Spears v. United States,* — S. Ct. —, —, 2009 WL 129044, *2 (Jan. 21, 2009) (per curiam) (recognizing the district courts' authority to vary from Guidelines based on policy disagreement, and not simply based on an individualized determination that they yield an excessive sentence in a particular case).

The Sentencing Reform Act "contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing, including 'to reflect the seriousness of the offense,' 'to promote respect for the law,' 'to provide just punishment for the offense,' 'to afford adequate

deterrence to criminal conduct,' and 'to protect the public from further crimes of the defendant.'" *Kimbrough,* 552 U.S. at —, 128 S. Ct. at 570 *(quoting* 18 U.S.C. § 3553(a)). The statute further provides that "in determining the appropriate sentence, the court should consider a number of factors, including 'the nature and circumstances of the offense,' 'the history and characteristics of the defendant,' 'the sentencing range established' by the Guidelines, 'any pertinent policy statement' issued by the Sentencing Commission pursuant to its statutory authority, and 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.'" *Id. (quoting* 18 U.S.C. § 3553(a)). A sentencing judge has greater familiarity with an individual case and individual defendant than the Commission or the appeals court and is "therefore 'in a superior position to find facts and judge their import under § 3353(a)' in each particular case." *Kimbrough,* 552 U.S. at —, 128 S. Ct. at 574 (*quoting Gall,* 552 U.S. at —, 128 S. Ct. at 597).

Although the Guidelines remain "the starting point and the initial benchmark" in determining a sentence, the district court "may not presume that the Guidelines range is reasonable," but must "make an individualized assessment based on the facts presented." *Gall,* 552 U.S. at —, 128 S. Ct. at 596-97. "[A]fter giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party." *Id.,* 552 U.S. at —, 128 S. Ct. at 596. If the court decides that an outside-Guidelines sentence is warranted, the court must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. *Id.* The Supreme Court rejects, however, the notion that "'extraordinary'

circumstances [are required] to justify a sentence outside the Guidelines range" and rejects "the use of a rigid mathematical formula that uses the percentage of a departure as the standard for determining the strength of the justifications required for a specific sentence." *Id.* at 595.

Congress established the Sentencing Commission ("the Commission") "to formulate and constantly refine national sentencing standards," in fulfillment of its important institutional role. *Kimbrough,* 552 U.S. at —, 128 S. Ct. at 57; *Rita v. United States,* 551 U.S. at —, 127 S. Ct. at 2464. When operating within that institutional role, the Sentencing Commission "has the capacity courts lack" and can "'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise.'" *Kimbrough,* 552 U.S. at —, 128 S. Ct. at 574 (*quoting United States v. Pruitt,* 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)). In formulating the Guidelines, the Commission developed and used data on past practices and recidivism. *See* United States Sentencing Commission, Fifteen Years of Guidelines Sentencing (Nov. 2004) ("Fifteen-Year Assessment") at 14; U.S.S.G. § 1A.1, intro. comment., pt. A, ¶ 3; *Kimbrough,* 552 U.S. at —, 128 S. Ct. at 567. *Gall,* 552 U.S. at —, 128 S. Ct. at 594 (noting that the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions"). Based on these sentencing statistics, the Commission established the offense levels for each crime, linked to a recommended imprisonment range. Fifteen-Year Assessment at 14. Accordingly, in many cases the Guidelines represent a reasonable estimation of a fair sentencing range. *See Kimbrough,* 128 S. Ct. at 574.

For policy reasons, the Commission did not employ its characteristic empirical approach when setting the Guidelines ranges for drug crimes. Fifteen-Year Assessment, Executive Summary at 15, 72-73; *Kimbrough,* 552 U.S. at —, 128 S. Ct. at 567 (regarding drug crimes). Instead, the Commission attempted "to accommodate and, to the extent possible, rationalize mandatory minimum provisions established by the 1986 Anti-Drug Abuse Act" by anchoring the Guidelines to the mandatory minimum sentences. United States Sentencing Commission, Special Report to Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System (August 1991), accessed at www.ussc.gov/reports.htm (hereinafter, "Mand. Min. Rep't"), Summary at ii; Rep't at 17 n.58.

The Commission thus adopted "the 1986 [Anti-Drug-Abuse] Act's weight-driven scheme." *Kimbrough,* 552 U.S. at —, 128 S. Ct. at 567; *see* Chapman v. United States, 500 U.S. 453, 461 (1991) (stating that the Anti-Drug Abuse Act of 1986 provided for mandatory minimum sentences based on the weight of various controlled substances according to a "market-oriented" approach, creating a penalty scheme intended to punish large-volume drug traffickers severely). "The 1986 Act uses the weight of the drugs involved in the offense as the sole proxy to identify 'major' and 'serious' dealers."[1] *Kimbrough,* 128 S. Ct. at 567. The resulting Guidelines ranges for drug trafficking offenses are driven by the quantity of drugs, and keyed to statutory mandatory minimum sentences

---

[1] Although both the mandatory minimum statutes and the Guidelines calibrate punishment of drug traffickers according to quantity, the Supreme Court has acknowledged that mandatory minimum sentences are both structurally and functionally at odds with sentencing guidelines and the goals the Guidelines seek to achieve, noting that "the guidelines produce a system of finely calibrated sentences with proportional increases whereas the mandatory minimums result in 'cliffs.'" *Neal v. United States*, 516 U.S. 284, 291 (1996). Nonetheless, the Supreme Court has continued to affirm the scheme, leaving it to Congress to correct its disparities. *Id.*; United States v. LaBonte, 520 U.S. 751, 764 (1997).

based on weight. *Gall,* 128 S. Ct. at 594 & n.2; *Neal v. United States,* 516 U.S. 284, 291-92 (1996) (noting that in spite of "incongruities between the Guidelines and the mandatory sentencing statute," the Commission developed Guidelines to parallel the mandatory minimum sentences set out in 21 U.S.C. § 841(b)(1), using the quantities and sentences derived from the statute and "[t]he weight ranges reflect the Commission's assessment of equivalent culpability among defendants who traffic in different types of drugs. . . .").

Noting that larger drug dealers were subject to a mandatory minimum of ten years for a first offense and twenty years for a subsequent conviction for the same offense, the Sentencing Commission stated that "[the Act] sought to cover mid-level players in the drug distribution chain by providing a mandatory minimum penalty of five years." *Id.* at 10. Later, in "[p]erhaps the most far-reaching provision of the Omnibus Anti-Drug Abuse Act of 1988," Congress made the mandatory minimum penalties that were previously applicable to substantive distribution and importation/exportation offenses apply also to conspiracies to commit those substantive offenses, increasing "the potential that the applicable penalties could apply equally to the major dealer and the mid- or low-level participant." *Id.* at 10.

Because the Sentencing Commission accounted for ordinary post-offense rehabilitation in providing an adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1, a defendant's rehabilitation must be exceptional enough to be atypical in order to warrant a departure on that basis. *See United States v. Rogers,* 400 F.3d 640 (8th Cir. 2005). However, factors that were discouraged or prohibited as departure factors under the mandatory Guidelines may be considered in connection with the § 3553(a) analysis. *United States v. Lazenby,* 439 F.3d 928, 933 (8th Cir. 2006). "[P]re-*Booker* departures and

post-*Booker* variances are not the same" and there may be "cases that would not justify a departure under the Guidelines but which are appropriate for a variance" as well as "cases in which a combination of a Guidelines departure and other § 3553(a) factors may produce a lower reasonable sentence than a departure alone." *United States v. Robinson,* 454 F.3d 839, 842 (8th Cir. 2006). A defendant's post-arrest rehabilitation "is relevant in evaluating the § 3553(a) factors. *United States v. Shy,* 538 F.3d 933 938 (8th Cir. 2008) (affirming a variance to probation for extraordinary post-arrest rehabilitation, noting that rehabilitation was genuine and the defendant was a positive contributor to society); *United States v. McFarlin,* 535 F.3d 808, 811 (8th Cir. 2008) (affirming variance to probation based on health and extraordinary post-arrest rehabilitation).

    B. Analysis

        1. Initial Guidelines Calculation

The court generally accepts the facts set forth in the PSR and finds the defendant's offense level is 29 and criminal history category is IV.

        2. Departure

For the reasons discussed below in connection with a sentence outside the Guidelines, the court finds that the defendant's motion for a downward departure should be granted. The court finds the defendant's rehabilitation is exceptional enough to be atypical.

        3. Section 3553 factors

In consideration of the sentencing factors set forth in 18 U.S.C. § 3553(a), the court finds that a sentence of 60 months (the statutory minimum), served concurrently to any

sentence imposed in state court, is sufficient, but not greater than necessary to accomplish the goals of sentencing. The court will accordingly grant the defendant's motion for a sentence outside the Guidelines.

With respect to the nature of the offense, the court notes that conspiracy to manufacture methamphetamine is undoubtedly a serious offense. However, Nincehelser's conduct, though undoubtedly criminal, was a step removed from the actual manufacturing of or trafficking in methamphetamine. Procuring precursor chemicals, though a necessary step in manufacture, is less serious than the actual manufacture and sale of methamphetamine. There is no evidence that Nincehelser was more than a small player in the methamphetamine manufacturing enterprise. Under the Guidelines market-based approach, an important consideration is where the defendant falls within the hierarchy of a drug distributing or manufacturing conspiracy. The defendant's role was to purchase precursor chemicals for Baney. Clearly, she purchased a significant quantity of pseudoephedrine. However, in view of her attenuated role in the conspiracy, this is one of the cases in which the quantity determination does not serve as a reliable proxy for culpability.

The court has also considered the history and characteristics of the defendant. *See* 18 U.S.C. § 3553(a)(1). Ms. Nincehelser is a twenty-six-year-old woman with a GED. She has had considerable hardship in her life and most of her problems are linked to drug and alcohol addiction. She has been diagnosed with several mental illnesses and has been prescribed numerous medications. Although her criminal history category is high, criminal history points were assessed for crimes that reflected her drug dependence. Her mental

and emotional conditions and drug dependence made her a target for exploitation and abuse by men in her life.

Nincehelser's rehabilitation is relevant to the determination of a reasonable sentence under § 3553(a) in that it relates to her history and characteristics. The evidence establishes that her rehabilitation has been extraordinary. Not all defendants who are provided the option of chemical dependency treatment take advantage of the opportunity to the extent that Ms. Nincehelser has. Also, it is rare that a drug offender with such a significant and intractable history of drug abuse can successfully complete drug treatment programs as demanding as those Ms. Nincehelser has completed. The court appreciates the difficulty of a defendant's overcoming a long-standing addiction, especially to methamphetamine. The court can envision a positive result for Ms. Nincehelser. The court finds that Nincehelser's efforts at recovery and rehabilitation are atypical and exceptional.

In formulating this sentence, the court has considered the sentencing range established by the Guidelines, but, because the drug offense Guidelines were promulgated pursuant to Congressional directive rather than by application of the Sentencing Commission's unique area of expertise, the court affords them less deference than it would to empirically-grounded Guidelines. *See Kimbrough*, 552 U.S. at —, 128 S. Ct. at 574-75. Also, the Guidelines calculation is driven by drug quantity, which in this case is substantial. Under the Guidelines market-based scheme, quantity can be one measure of the seriousness of a drug offense, but when combined with a conspiracy offense that occurred over a considerable span of time, it is not always a trustworthy measure of the culpability of an individual defendant. The record shows that the defendant was a regular customer

of the methamphetamine conspiracy and she purchased pseudoephedrine for her supplier. To sentence Nincehelser as responsible for such a substantial quantity would exaggerate her culpability and would not be an accurate measure of her blameworthiness vis-a-vis the other participants in the scheme.

This sentence also satisfies the need to avoid unwarranted sentencing disparities. Nincehelser's co-conspirators were sentenced to ten and twenty years. A sentence of five years for Ms. Nincehelser is proportionate in light of her culpability.

This sentence also satisfies the purposes of sentencing. The court finds that a sentence including some period of incarceration is necessary to achieve the goals of sentencing and to establish some level of proportionality with respect to other drug-trafficking crimes and to reduce the perception of unwarranted disparity. Because drug manufacturing is a dangerous venture, public safety considerations call for imposition of a term of incarceration. A sentence of 60 months reflects the seriousness of the offense, promotes respect for the law and provides just punishment. This is a significant sentence and is proportional to the longest sentence she previously served. A sentence of five years for this sort of crime will enhance the public's confidence in the criminal justice system. The defendant has already suffered serious consequences of her crime. These factors, along with a significant term of imprisonment, will deter others from engaging in similar criminal conduct. The value of any additional prison time as a deterrent would be marginal. The court finds that the defendant is unlikely to reoffend, so this sentence is more than sufficient to protect the public from further crimes. Also, because of changes in the law making it more difficult to purchase pseudoephedrine, there is less need to protect the public from methamphetamine manufacturing crimes. The need to protect society from

further crimes of the defendant is also accounted for in the court's imposition of supervised release.

A Judgment and Commitment and a Statement of Reasons in conformity with this Sentencing Memorandum will issue this date.

DATED this 30th day of March, 2009.

BY THE COURT:

s/ Joseph F. Bataillon
Chief District Judge